IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARIA FABELA, et al., §
§
Plaintiffs, §
§ Civil Action No. 3:10-CV-1425-D
VS. §
§
CITY OF FARMERS BRANCH, §
TEXAS, et al., §
§
Defendants. §

MEMORANDUM OPINION
AND ORDER

This lawsuit presents the question whether the at-large system of electing members

of the City Council of the City of Farmers Branch, Texas ("Farmers Branch") violates § 2

of the Voting Rights Act of 1965, 42 U.S.C. § 1973.  Following a bench trial, and for the

reasons that follow,[1] the court finds that it does.

I

Plaintiffs are Hispanic residents of Farmers Branch,[2] which is located in Dallas

County, Texas.  They bring this action under § 2 of the Voting Rights Act against Farmers

Branch and several Farmers Branch public officials, in their official capacities.[3]  Farmers

_____

[1]The court sets out in this memorandum opinion and order its findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).

[2]Plaintiffs are Maria Fabela, Alfonso Baladez, Amelia Baladez, Maria Baladez, Maria Jacobo, Antonio Reyes, Maria Reyes, Diana Rosas, Leticia Torres, and Jose Villaneda.

[3]Defendants are Farmers Branch, Tim O'Hare, Harold Froelich, Michelle Holmes, David Koch, Ben Robinson, and Tim Scott.

Branch is governed by a City Council consisting of six members—a mayor and five council members—who are elected at-large, but run for specific seats.  The Farmers Branch electoral system requires run-off elections when no candidate receives a majority of the vote for a particular seat.  City Council members serve staggered three-year terms and are term-limited.

According to the last Decennial Census ("the Census"), in 2010 Farmers Branch had a population of 28,616, of whom 21,776 were of voting age ("VAP").  Hispanics comprised 45.37% of the city's population and 38.12% of the voting age population ("VAP").  According to the five-year (2006-2010) American Community Survey ("ACS"), of the 8,300 adult[4] Hispanics in Farmers Branch, 3,999 were citizens and 4,301 were non-citizens.[5]  Hispanics therefore comprised 23.95% of the citizen voting age population ("CVAP"), while Caucasians[6] comprised 66.30% of the CVAP.[7]

The Census formerly consisted of a "short form," received by every household in the United States, and a "long form," sent to approximately one in every six households.  The "long form" obtained more information about a person, including citizenship status.  The U.S. Census Bureau ("Census Bureau") no longer uses the "long form" questionnaire and

---

[4]Throughout this memorandum opinion and order, the term "adult" means a person age 18 or older and therefore eligible by age to vote.

[5]For purposes of this decision, it is irrelevant whether a non-citizen was present in Farmers Branch legally or illegally.

[6]Throughout this memorandum opinion and order, the term "Caucasian" means white persons who are neither Hispanic nor Latino.

[7]African-Americans comprised 5.11% of the CVAP, and all other races and ethnicities comprised the remaining 4.64%.

relies solely on ACS data to perform demographic sampling of the United States population. The ACS is the only source of data regarding citizenship produced by the Census Bureau. Unlike the Census, the ACS is not an actual population count; instead, the ACS estimates population by sampling approximately three million households annually. Although ACS data are released annually, the Census Bureau recommends using the three-year or five-year aggregations of ACS data when working with smaller populations due to the relatively small number of households surveyed.

Plaintiffs maintain that Farmers Branch's system of electing City Council members at-large denies Hispanic voters the opportunity to participate meaningfully in the electoral process and to elect representatives of their choice, in violation of § 2 of the Voting Rights Act.[8] "No Hispanic has been elected as a member of city council or mayor of the City under the at-large election system." Pretrial Order ¶ 5 (stipulation of fact). There have been at least four recent elections in which a Hispanic candidate has run for the City Council and lost, despite receiving a majority of the Hispanic vote.

---

[8]Although plaintiffs challenge the Farmers Branch system of electing members of the City Council, and they often include the office of mayor when describing the composition of the City Council, plaintiffs do not suggest that the mayor should be elected by fewer than all eligible voters of Farmers Branch. *See* Tr. 1:14 (stating in plaintiffs' opening statement: "We're asking for one district, 1 out of 5."); and 18 (stating in plaintiffs' opening statement: "That's not why we're here, only that they be given the same opportunity to elect but one of five seats to Farmers Branch City Council."); *cf.* Pretrial Order ¶ 12 (listing as contested issue of fact "[w]hether a lawful council district can be drawn in the City that includes a Hispanic citizen-voting-age majority[.]").

- 3 -

II

"In 1982 Congress substantially revised § 2 of the Voting Rights Act to clarify that a violation requires evidence of discriminatory effects alone, and to make clear that proof of discriminatory intent is not required to establish a violation of Section 2." *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F.Supp.2d 451, 455 (N.D. Tex. 2010) (Fitzwater, C.J.) ("*Benavidez v. Irving ISD*") (quoting *League of United Latin Am. Citizens # 4434 (LULAC) v. Clements*, 986 F.2d 728, 741 (5th Cir. 1993) ("*LULAC I*") (internal quotation marks omitted).  Section 2(b) now provides that the Act is violated if,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [a class of persons of a certain race or color] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

*Id.* (quoting 42 U.S.C. § 1973(b)).

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first considered the 1982 amended version of § 2, setting out the current framework for analyzing § 2 cases.

> To prevail on a § 2 claim, a plaintiff must first prove that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district," (2) the minority group "is politically cohesive," and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running

- 4 -

> unopposed—usually to defeat the minority's preferred candidate."

*Benavidez v. Irving ISD*, 690 F.Supp.2d at 455 (citations omitted) (quoting *Gingles*, 478 U.S. at 50-51). "Failure to establish any one of the *Gingles* factors precludes a finding of vote dilution, because these circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice." *Id.* (quoting *LULAC I*, 986 F.2d at 743) (internal quotation marks and brackets omitted). "[The Fifth Circuit] has interpreted the *Gingles* factors as a bright line test." *Id.* at 456 (brackets in original) (quoting *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999)). "Each factor must be proved. Failure to establish any one of these threshold requirements is fatal." *Id.* (quoting *Valdespino*, 168 F.3d at 852) (citations, brackets, and some internal quotation marks omitted)

> If a plaintiff meets the threshold *Gingles* test, the court must then engage in a broader totality of the circumstances inquiry, considering whether the minority group has demonstrated that under the totality of the circumstances, its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* at 456 n.7 (quoting *LULAC I*, 986 F.2d at 747) (internal quotation marks omitted). In conducting this broad inquiry, a court must be "flexible in its totality inquiry and guided by factors drawn from the Senate Judiciary Committee report on the 1982 amendments to the Voting Rights Act and reference *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973)." *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 292 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at

44).  "[T]he determination whether [an] at-large election scheme violates section 2 'depends upon a searching practical evaluation of the past and present reality' and on a 'functional view of the political process.'"  *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) ("*Westwego III*") (quoting *Gingles*, 478 U.S. at 45; *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1204 (5th Cir. 1989) ("*Westwego I*")).  These factors include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> 6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Brewer v. Ham*, 876 F.2d 448, 451 n.4 (5th Cir. 1989) (quoting S. REP. NO. 417, 97th Cong., 2d. Sess., *reprinted in* 1982 U.S.C.C.A.N. 177 at 206-07); *see also Gingles*, 478 U.S. at 36-37.  The following additional factors may also be probative in determining whether there is a voting rights violation:

> (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
> (2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

*Brewer*, 876 F.2d at 451 n.4 (quoting S. REP. NO. 417, 97th Cong., 2d. Sess., *reprinted in* 1982 U.S.C.C.A.N. 177 at 206-07); *see also Gingles*, 478 U.S. at 36-37.  The existence of racially polarized voting and the extent to which minority group members have been elected to public office are the most important factors to be considered.  *See Gingles*, 478 U.S. at 51 n.15.  "If these two Senate factors are present, 'the other factors . . . are supportive of, but not essential to, a minority voter's claim.'"  *Benavidez v. City of Irving, Tex.*, 638 F.Supp.2d 709, 732 (N.D. Tex. 2009) (Solis, J.) ("*Benavidez v. City of Irving*") (ellipsis in original) (quoting *Gingles*, 478 U.S. at 51 n.15).  The factors listed above, however, are "neither comprehensive nor exclusive;" "other factors may also be relevant and may be considered."  *Gingles*, 478 U.S. at 45.

> Multimember districts and at-large election schemes . . . are not per se violative of minority voters' rights.  Minority voters who contend that the multimember form of districting violates § 2, must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates.

*Benavidez v. Irving ISD*, 690 F.Supp.2d at 456 (ellipsis in original) (quoting *Gingles*, 478 U.S. at 48 (internal citations omitted).  "A plaintiff must prove a § 2 violation by a preponderance of the evidence."  *Id.* (citing *League of United Latin Am. Citizens #4552*

*(LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997)).[9]

### III

### A

Under the first prong of *Gingles*, plaintiffs must prove that the Hispanic population in Farmers Branch is "sufficiently large and geographically compact to constitute a majority in a single member district." *LULAC I*, 986 F.2d at 742. To satisfy this requirement, plaintiffs must establish that there is a potential single member district (the "demonstration district") in which a majority of the CVAP is Hispanic. *See id.* at 743; *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir. 2009) (holding that only CVAP is relevant in evaluating first prong of *Gingles* ). In *Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality opinion), the Supreme Court considered the "minimum-size question," concluding that the majority-minority rule "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting age population in the relevant geographic area?" *Id.* at 18. "That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2." *Id.* This requirement is essential to demonstrate that "minority voters possess the *potential* to elect representatives." *Gingles*, 478 U.S. at 50 n.17 (emphasis in original).

"The appropriate method of establishing the first [*Gingles*] factor is a 'matter of fact'

---

[9]Although the court does not repeat the preponderance of the evidence standard in this memorandum opinion and order, all of its findings of fact are based upon a preponderance of the evidence.

which the plaintiff must prove, but there is 'no uniform method.'"  *Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1046-47 (5th Cir. 1990) ("*Westwego II*") (quoting *Brewer*, 876 F.2d at 452).  "Because of frequent difficulties of proof and in light of the fact that vote dilution cases often become 'prohibitively expensive,' the Court [in *Gingles*] espoused a 'flexible, fact intensive test.'"  *Id.* at 1046 (quoting *Gingles*, 478 U.S. at 46, 73)); *see also Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 502 (5th Cir. 1987) (*Gingles* "suggests flexibility in the face of sparse data[.]").

Plaintiffs rely on the expert testimony of David Ely ("Ely") to satisfy this element of *Gingles*.[10]  Ely used data from the 2010 Census and from multiple years of the ACS to draw four illustrative districts.  Each district's Hispanic CVAP is greater than 50%.  Defendants' expert, Norfleet W. Rives, Ph.D. ("Dr. Rives"), confirmed that if Ely's methodology and more recent ACS data are used, each illustrative district's Hispanic CVAP is greater than 50%.  The two experts' Hispanic CVAP estimates are as follows:

---

[10] "As is commonly the case in § 2 litigation, [plaintiffs'] claim turns on the expert witnesses' factual testimony."  *Benavidez v. Irving ISD*, 690 F.Supp.2d at 457 n.9 (quoting the statement in *LULAC I*, 986 F.2d at 736, that "[a]s with all cases under the Voting Rights Act, this one is driven by the facts.").

| Hispanic CVAP Estimates | Illustrative District #1 | Illustrative District #2 | Illustrative District #3 | Illustrative District #4 |
|---|---|---|---|---|
| Ely | 53.76% | 55.23% | 57.29% | 51.99% |
| Dr. Rives | 53.1% | 52.9% | 54.9% | 53.7% |

Ds. Ex. 33, Table 1; Ps. Ex. 1 at 8 and Ex. 4 at 3. Ely testified that each illustrative district

satisfies the first *Gingles* prong and that any of the four could be the demonstration district.

Defendants challenge these conclusions.

The Supreme Court has made clear that the 50%+ threshold[11] for the first prong of

*Gingles* is a bright line test. Because both sides' experts agree that Ely's methodology

creates four illustrative districts whose Hispanic CVAP is greater than 50%, the court must

decide whether the data and methodology that Ely used to estimate the Hispanic CVAP are

sufficiently reliable.[12]

_____

[11]By "50%+" the court means "more than 50 percent of the voting-age population in the relevant geographic area," as *Bartlett* requires. *See Bartlett*, 556 U.S. at 18.

[12]In the Fifth Circuit, "Census figures are presumed accurate until proven otherwise. Proof of changed figures must be thoroughly documented, have a high degree of accuracy, and be clear, cogent and convincing to override the presumptive correctness of the prior decennial [C]ensus." *Valdespino*, 168 F.3d at 853-54 (quoting district court opinion). In *Benavidez v. Irving ISD* this court held that the plaintiff had not met his burden of proof under this heightened evidentiary standard. But unlike the plaintiff in that case, the plaintiffs in this suit are not attempting to overcome the presumed accuracy of a census (here, the 2010 Census). And they are relying on a five-year (2005-2009) ACS in combination with the recent 2010 Census rather than, as in *Benavidez v. Irving ISD*, on a one year ACS in combination with the dated 2000 Census. *See Benavidez v. Irving ISD*, 690 F.Supp.2d at 458 ("Ely did not have access to any three-year or five-year data when he created his report, and thus relied only on the 2007 one-year ACS data."). It is therefore unnecessary for the plaintiffs in this case to satisfy the heightened evidentiary standard set forth in *Valdespino*.
The parties dispute whether the ACS is entitled to the same presumption of accuracy as is the Census. Because plaintiffs' evidence is sufficiently reliable to prove by a

B

To create the four illustrative districts, Ely relied on the 2010 Census to determine the population and VAP, broken down by race and Hispanic origin.  And because the Census does not include citizenship information, to estimate CVAP, he relied on the citizenship estimates provided by the ACS.  Although both the Census and the ACS are conducted and prepared by the Census Bureau, there are notable differences between the two.

First, the Census surveys the entire population of the United States, while the ACS provides estimates based on a relatively small number of surveys.  Due to the sample size of the ACS, the Census Bureau cautions that annual ACS data are not reliable for populations smaller than 65,000.  The Census Bureau does, however, aggregate ACS data from three- and five-year periods to create reliable data for smaller populations; therefore, the Census Bureau recommends using the published five-year ACS aggregation rather than the annual ACS for reliable data for geographic areas with 20,000 or fewer persons.

Second, the smallest geographic unit for which the Census provides data is the census block, which is approximately equivalent to a city block.  The Census also provides data at the block group level, which is the aggregation of anywhere from a few census blocks to as many as over one hundred census blocks, and the census tract level, which is the aggregation of three to nine block groups.  The ACS typically provides only citizenship data at the census

---

preponderance of the evidence that at least one illustrative district's Hispanic CVAP is greater than 50%, the court need not decide whether the ACS is entitled to a presumption of accuracy.

tract level, but the United States Department of Justice requested a special tabulation of the citizenship data at the block group level. Ely used this special tabulation, in conjunction with data from the 2010 Census, to calculate Hispanic CVAP at the block group level.

Ely could not aggregate only whole block groups to create an illustrative district that would allow it to have equal population with the four other districts in Farmers Branch; four-block groups made the illustrative district too small, and five-block groups made it too large. It was therefore necessary for Ely to divide at least one block group into block levels so that he could include a portion of one block group in the illustrative district. To estimate the CVAP for each block in a block group, Ely apportioned the block group's CVAP evenly across the block group's population. In other words, Ely multiplied the CVAP in the block group by the proportion of the block group's total population contained in a particular block, and this calculation resulted in a CVAP estimate for each block. With this estimate, Ely then included and excluded blocks in the illustrative districts so that each illustrative district contained relatively the same population, i.e., one-fifth of the Farmers Branch population. Once the illustrative districts were created, Ely calculated a percentage point estimate of the Hispanic CVAP in each illustrative district. The point estimate is the most likely value given by the data and methodology, but, as an estimate, it is subject to a margin of error. Ely's calculations demonstrate that the Hispanic CVAP point estimate for each illustrative district is greater than 50%.

In addition to calculating the Hispanic CVAP for the four illustrative districts, plaintiffs have attempted to corroborate the Hispanic CVAP estimates by calculating the

number of Spanish surname registered voters ("SSRV") in each illustrative district. According to both Ely and Dr. Rives, and as demonstrated in the following table, SSRV constitute nearly 50% of the illustrative districts' registered voters:

| SSRV | Illustrative District #1 | Illustrative District #2 | Illustrative District #3 | Illustrative District #4 |
|---|---|---|---|---|
| Ely | 47.0% | 45.6% | 47.9% | 50.3% |
| Dr. Rives | 46.8% | 45.4% | 48.1% | 49.9% |

Ds. Ex. 33, Table 2; Ps. Ex. 4 at 2.

C

Defendants acknowledge that Ely's methodology results in a Hispanic CVAP greater than 50% in all four illustrative districts, but they argue that there are several methodological problems with Ely's opinions that cause his Hispanic CVAP estimates to be unreliable. Defendants maintain that the ACS is unreliable when used for small geographic areas because the small sample size creates very large margins of error; combining data from the Census and the ACS is unreliable because they use different definitions of "resident" and because the Census measures populations on a certain day while the five-year ACS measures populations over the course of a five-year period; Ely's method of apportioning citizens and non-citizens equally at the block level is inaccurate because non-citizens are often concentrated in certain areas, such as in rental housing; Hispanics consistently over-report citizenship by naturalization when responding to surveys; and the ACS significantly over-represents the number of Hispanics in Dallas County, as demonstrated by a comparison of

the 2010 ACS and 2010 Census data.  Defendants also contend that SSRV data are unreliable because studies have shown that voter registration rolls are consistently inaccurate since, *inter alia*, voters who have moved from an area may not be removed from the voter registration rolls for several years.

Plaintiffs respond that defendants have not shown that Ely's Hispanic CVAP point estimates for the illustrative districts, which are all greater than 50%, are not the most likely Hispanic CVAP percentages, but instead only argue that the values are uncertain.  Plaintiffs maintain that if Ely's estimates are the most likely Hispanic CVAP percentages, they have satisfied the first prong of *Gingles* by a preponderance of the evidence, because a point estimate above 50%—even with a large margin of error—proves that the Hispanic CVAP is more likely than not above the 50%+ threshold.  Plaintiffs also contend that all of defendants' arguments about the uncertainty of the ACS are irrelevant because the SSRV data, which are not subject to a margin of error or the same methodological uncertainties as are the ACS data, corroborate the accuracy of Ely's Hispanic CVAP estimates.

D

The court finds that plaintiffs have proved that they can draw a demonstration district that contains greater than 50% Hispanic CVAP and have therefore satisfied the first prong of *Gingles*.[13]

---

[13]Defendants advance several related arguments, including under the one-person, one-vote principle of the Equal Protection Clause, based on the underlying contention that, to achieve Hispanic CVAP of greater than 50%, plaintiffs must draw a district that is packed with non-citizens, thereby diluting the power of voters (including Hispanics) in the other

_____

districts. *See, e.g.,* Ds. Prop. Find. Fact No. 96 ("The critical feature of any effort to draw a potential Hispanic-majority electoral district in Farmers Branch is the ability to pack the district with non-citizens."). In addition to their one-person, one-vote challenge, defendants maintain that this precludes plaintiffs from proving their § 2 claim. *See* Pretrial Order ¶ 2 (contending, in defendants' summary of defense, that "under both the *Gingles* threshold test and the totality of the circumstances, the fact that any district the plaintiffs might be able to draw is composed primarily of non-citizens rather than Hispanic citizen-voting-age population precludes a finding of a violation of section 2 of the Voting Rights Act."). And they argue that the failure of Farmers Branch to create a single member district composed of so many non-citizens does not violate § 2 of the Voting Rights Act. Defendants posit that "[t]he focus of the [Voting Rights Act] inquiry is [on] equality of political opportunity." Ds. Prop. Concl. Law 17. And "[w]here it is necessary to create districts that are packed with abnormally high numbers of non-citizens if the plaintiff group is to be able to constitute a potential majority of citizens, then there is no denial of equal political opportunity." *Id.* at 18. Defendants' arguments are set out in the pretrial order in the single contested issue of law:

> If there is a substantial disparity in the number of voting-age citizens among districts that have relatively equal overall populations, is that fact relevant to the *Gingles* inquiry? In particular: (1) can the first prong of the *Gingles* be satisfied when the district at issue achieves population balance by means of a substantially larger concentration of non-citizens than is present in other districts; (2) does the concentration of a large number of non-citizens in a district result in an equal protection violation under jurisprudence interpreting the one person-one vote rule; and (3) does the protection of the Voting Rights Act extend to a group that meets the geographically numerous test of *Gingles* but is composed primarily of non-citizens?

Pretrial Order ¶ 17 (contested issue of law).

The court disagrees with defendants' positions. Regarding defendants' one-person, one-vote challenge, among the options available to Farmers Branch to remedy a § 2 violation is to draw single-member districts based on total population. *See Chen v. City of Hous.*, 206 F.3d 502, 522-28 (5th Cir. 2000) (holding that courts should not interfere with sovereign's decision to apportion electoral districts by total population or CVAP). In fact, in closing argument, defendants' counsel stated that it is "permissible to do total population, which I agree is *the normal and customary way* of doing it." Tr. 3:153 (emphasis added). Defendants have cited no case, and the court has found none, that has rejected a § 2 claim

- 15 -

Several aspects of Ely's data, methodology, and evidence are undisputed. First, both sides' experts, when using Ely's methodology, calculate the Hispanic CVAP point estimate of each of the four illustrative districts as greater than 50%. Ely testified, and defendants' experts did not contest, that a point estimate is the most likely Hispanic CVAP percentage in each illustrative district, as determined by Ely's data and methodology. Second, the evidence establishes that Ely used the most accurate data readily available to calculate the Hispanic CVAP point estimates. As the court has explained above, Ely calculated the Hispanic CVAP point estimates using population data from the presumptively reliable 2010 Census and Hispanic citizenship data from the five-year (2005-2009) ACS. The Census does not provide citizenship data, and the ACS is the only source of citizenship data collected by

---

where the plaintiff satisfied the *Gingles* factors and the political subdivision had the option of remedying the § 2 violation through an electoral system that complied with the one-person, one-vote requirement of the Equal Protection Clause (e.g., districts based on total population).

And defendants' contentions that plaintiffs cannot prove a § 2 violation when it is necessary to include so many non-citizens in the demonstration district, and that Farmers Branch has no obligation under § 2 to create a single member district composed of so many non-citizens, must fail absent binding authority that either ground is a basis for rejecting a § 2 claim. Defendants attempt to argue by analogy that plaintiffs cannot satisfy the first prong of *Gingles*. In a proposed conclusion of law, they cite *Concerned Citizens for Equality v. McDonald*, 63 F.3d 413, 417 (5th Cir. 1995), for the proposition that a plaintiff "cannot circumvent the first prong of *Gingles* by artificially reducing the number of minority group members necessary to constitute a majority in a district through assuming a larger number of districts, and hence a smaller district population, than currently exists." Ds. Prop. Concl. Law No. 15. From this premise they argue that "[t]he same reasoning precludes attempted circumvention of *Gingles* by packing the district with non-citizens so that fewer citizens are required to establish a citizen-voting-age population majority." *Id.* But defendants do not cite any binding decision that holds that a plaintiff cannot satisfy the first prong of *Gingles* by including a particular number of non-citizens in the demonstration district.

the Census Bureau.  Moreover, the five-year ACS is the most reliable version of the ACS for analyzing small populations.  Although plaintiffs could perhaps have conducted their own survey in Farmers Branch (even to the point of going door-to-door and counting heads), the law recognizes that plaintiffs attempting to prove § 2 violations should be allowed flexibility; otherwise, many § 2 cases would be prohibitively expensive to prosecute.  *See Westwego II*, 906 F.2d at 1046 ("Because of frequent difficulties of proof and in light of the fact that vote dilution cases often become 'prohibitively expensive,' the Court [in *Gingles*] espoused a 'flexible, fact intensive test.'"); *see also Citizens for a Better Gretna*, 834 F.2d at 502 (*Gingles* "suggests flexibility in the face of sparse data[.]").  And defendants do not suggest that there are more reliable data sources regarding citizenship.[14]

Rather than dispute the application of Ely's data to his methodology or adduce evidence that the Hispanic CVAP in Ely's illustrative districts does not satisfy the 50%+ threshold, defendants attempt to impeach Ely's data and methodology used to calculate the point estimates, contending on several grounds that they are not sufficiently reliable.

---

[14]The court is not holding that, if plaintiffs use the most reliable data available or use the five-year ACS, they will necessarily satisfy the first prong of *Gingles*.  But because the law recognizes the difficulties that can be encountered when attempting to prove voter dilution claims and permits flexibility in doing so, the fact that Ely relied on the most reliable form of readily available citizenship data is relevant in assessing his opinions and analyzing the first *Gingles* factor.  Moreover, if the court were to hold in this case that the data on which plaintiffs rely are too unreliable to satisfy the first prong of *Gingles*—especially when strongly corroborated by actual SSRV counts—it would in effect foreclose vote dilution cases in small geographic areas that include non-citizens, or it would essentially require that plaintiffs develop their own proof (such as by door-to-door surveys), which could be prohibitively expensive and chill § 2 litigation.

Defendants rely primarily on the following contentions to challenge Ely's Hispanic CVAP estimates: there are high margins of error for the ACS data;[15] combining data from the ACS and Census is statistically problematic; and there are various errors and uncertainties in estimating the number, location,[16] and citizenship status of the Hispanic population.[17]  None

---

[15]Although defendants have adduced evidence of the high margins of error for the Hispanic CVAP estimates in the block groups that Ely used to draw the four illustrative districts, they have not provided evidence of the more pertinent margin of error, i.e., the margin of error for the Hispanic CVAP for a given illustrative district.  Both sides' experts recognize that there is at least the potential for the margin of error to decrease once the block groups are aggregated into an illustrative district.  Without evidence of the pertinent margin of error, the court is not persuaded that it is so great as to render the ACS data unreliable.

[16]Defendants attempt to show that Ely's method of proportionally allocating Hispanic CVAP at the block level is problematic.  They have introduced evidence that, according to Ely's allocation method, several blocks either over- or under-allocate Hispanic CVAP. Blocks that have a greater SSRV total than total Hispanic CVAP likely under-allocate Hispanic CVAP; blocks that include apartment complexes likely over-allocate Hispanic CVAP because, according to defendants' evidence, rental housing typically has a higher non-citizen population than do single-family residences.  Defendants argue that because Ely's methodology assumes a constant citizenship rate across the blocks, his inclusion of blocks with apartment complexes in the illustrative districts likely results in an overestimation of Hispanic CVAP in that district.  As Dr. Rives testified, however, the blocks in the illustrative districts that have an SSRV greater than the Hispanic CVAP likely under-allocate the Hispanic CVAP in that block.  Defendants have not adduced evidence that demonstrates that over-allocation occurs to a greater degree than does under-allocation.  And to the extent that this can be inferred by the inclusion of several apartment complexes in the illustrative districts, defendants have not produced evidence that these allocation problems would reduce Ely's Hispanic CVAP point estimates below the 50%+ threshold.

[17]Defendants have not presented evidence that quantifies the degree to which the alleged uncertainties in the data affect Ely's Hispanic CVAP estimates.  In other words, defendants have not adduced evidence that any of these alleged deficiencies reduces Ely's Hispanic CVAP point estimates below the 50%+ threshold.  Instead, defendants advance several arguments that are intended to undermine the reliability of Ely's Hispanic CVAP point estimates and persuade the court that plaintiffs have failed to meet their burden of proof.

of these alleged statistical deficiencies, however, also applies to the SSRV data that plaintiffs rely on to corroborate the accuracy of Ely's Hispanic CVAP point estimates.[18]  This is so because the SSRV data are a count of actual registered voters rather than an estimate based on a sample of the population;[19] therefore, the SSRV data do not have a margin of error. Additionally, Dr. Rives testified that the SSRV numbers "are basically counts of registered voters that have been coded to 2010 census blocks, so there . . . really is no estimation involved there."  Tr. 2:147.[20]  Because the number of SSRV can be calculated at the block level with precision, there is no uncertainty caused by having to proportionally allocate block

---

[18]SSRV, of course, "is not the sole criteri[on] in the voting rights analysis," but it can be relevant in evaluating whether plaintiffs have satisfied the first prong of *Gingles*.  *See Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1219 (5th Cir. 1996); *see also Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 867 n.18 (5th Cir. 2004) ("[W]ithout a strict showing of [SSRV's] probativeness, Spanish-surname data are disfavored, and [C]ensus data based upon self-identification provides the proper basis for analyzing Section 2 vote dilution claims in the future.").  The court is not relying solely or even primarily on SSRV data to find that plaintiffs have established the first *Gingles* factor.  The court considers the SSRV data to be corroborative of Ely's Hispanic CVAP estimates because the SSRV data do not suffer from the same methodological problems that defendants argue make Ely's Hispanic CVAP estimates unreliable.

[19]Citing a PEW study, defendants argue that voter registration rolls are consistently inaccurate because voters who no longer live in the place in which they are registered can remain on voter registration rolls for years before being removed.  Defendants have not adduced evidence, however, that Farmers Branch voter registration rolls are inaccurate.  To the contrary, Dr. Rives testified, in effect, that Farmers Branch SSRV data are reliable, and he relies on the data in attempting to demonstrate that Ely's method of allocating Hispanic CVAP to the block level is problematic.  The court therefore finds that the evidence of SSRV data is reliable in corroborating that the Hispanic CVAP is greater than 50% in each illustrative district.

[20]Because one must be a citizen to vote and the SSRV data are not a survey, defendants' evidence regarding Hispanics' over-reporting of citizenship by naturalization is irrelevant to the accuracy of the SSRV data.

group data among the blocks, as Ely did to estimate the Hispanic CVAP.  Dr. Rives also

assumes that the SSRV numbers are "solid" and "good counts" because the Farmers Branch

voter registration rolls are "pretty clean."  *Id.* at 2:148 and 2:150.  Furthermore, according

to Ely and defendants' expert, John Alford, Ph.D. ("Dr. Alford"), SSRV percentages in a

given area are usually less than the Hispanic percentage of CVAP, because Hispanics

typically register to vote at lower rates than do Caucasians.  Therefore, if the SSRV

percentage in each illustrative district is slightly lower than Ely's Hispanic CVAP estimate,

this would provide strong corroborating evidence that Ely's estimate is reliable.  The

following table demonstrates that the evidence shows this to be the case:

|  | Expert | Illustrative District #1 | Illustrative District #2 | Illustrative District #3 | Illustrative District #4 |
|---|---|---|---|---|---|
| Hispanic CVAP | Ely | 53.76% | 55.23% | 57.29% | 51.99% |
|  | Dr. Rives | 53.1% | 52.9% | 54.9% | 53.7% |
| SSRV | Ely | 47.0% | 45.6% | 47.9% | 50.3% |
|  | Dr. Rives | 46.8% | 45.4% | 48.1% | 49.9% |

Ds. Ex. 33,  Table 1-2; Ps. Ex. 1 at 8 and Ex. 4 at 2-3.  The SSRV data demonstrate that the

methodological issues and high margins of error that defendants' experts maintain cause

Ely's Hispanic CVAP estimates to be unreliable do not affect the accuracy of Ely's Hispanic

CVAP estimates to the degree defendants suggest.  For example, according to Dr. Rives,

illustrative district 4 has a Hispanic CVAP of 53.7% (using Ely's data and methodology) and

an SSRV of 49.9%.  This is consistent with the testimony of both sides' experts that the

SSRV percentage is likely a few percentage points lower than the Hispanic CVAP

percentage; the court therefore finds that the SSRV data strongly corroborate the accuracy of the Hispanic CVAP estimates.

Plaintiffs have proved that, using the most accurate, readily-available data, a geographically compact demonstration district can be drawn in Farmers Branch in which Hispanics constitute more than 50% of the CVAP. The SSRV data corroborate the reliability of Ely's Hispanic CVAP point estimates. Accordingly, the court finds that plaintiffs have satisfied the first *Gingles* factor.[21]

IV

The court now considers the second and third prongs of *Gingles*, which, respectively, require plaintiffs to establish that Hispanics are "politically cohesive" and that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citations omitted).

_____

[21]The court recognizes that it is reaching a different result than did Judge O'Connor in *Reyes v. City of Farmers Branch*, 2008 WL 4791498 (N.D. Tex. Nov. 4, 2008) (O'Connor, J.), *aff'd*, 586 F.3d 1019 (5th Cir. 2009). But the plaintiffs in *Reyes* used different data and methodologies when attempting to prove the first *Gingles* factor; they did not use the five-year ACS, as did the plaintiffs in this case; and *Reyes* was decided before the 2010 Census was taken. The 2010 Census and the five-year ACS provide more recent population data for Farmers Branch. The different outcomes of *Reyes* and today's case reflect nothing more than differences in the proof that the plaintiffs offered in the two trials and the reality that the number of Hispanic CVAP has grown in Farmers Branch since the period at issue in *Reyes*.

A

Racially polarized voting, i.e., "where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes,'" is relevant to a vote dilution claim. *Id.* at 53 n.21 & 56 (alteration in original).  It tends to prove that the "minority group members constitute a politically cohesive unit," under the second *Gingles* prong, and that they are unable to elect representatives of their choice because, under the third *Gingles* prong, the majority group is "similarly politically cohesive" and votes "sufficiently as a bloc usually to defeat [their] preferred candidates." *Id.* at 56; *Teague*, 92 F.3d at 287-88; *see also, e.g.*, *Westwego I*, 872 F.2d at 1207 ("Evidence of racially polarized voting 'is the linchpin of a section 2 vote dilution claim' and is relevant to establishing [the second and third elements] in *Gingles*[.]") (citations omitted).  "[T]he extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Gingles*, 478 U.S. at 55-56.

> A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. The amount of white bloc voting that can generally "minimize or cancel," [minority] voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as

> majority vote requirements, designated posts, and prohibitions
> against bullet voting; the percentage of registered voters in the
> district who are members of the minority group; the size of the
> district; and, in multimember districts, the number of seats open
> and the number of candidates in the field.

*Id.* at 56 (citations omitted).

B

Plaintiffs' expert, Richard L. Engstrom, Ph.D. ("Dr. Engstrom"), presented data regarding four Farmers Branch City Council elections—in 2007, 2008, 2009, and 2011—because they are the most recent elections in which voters were presented with a Hispanic and non-Hispanic candidate. In each election, the Hispanic-preferred candidate lost. After receiving data from the Dallas County Elections Department regarding the names of voters who cast ballots, Ely used Spanish surnames to identify whether the votes were cast by Hispanics or non-Hispanics and provided this information to Dr. Engstrom. Dr. Engstrom then applied a statistical analysis called ecological inference ("EI"), which is accessible through R software ("EI in R"), to estimate the percentage of Hispanic and non-Hispanic voters who voted for the Hispanic candidate in each election.[22] His report offers the point

---

[22]Although Dr. Engstrom originally used three widely-accepted methods of statistical analysis—EI, homogeneous precinct analysis ("HPA"), and ecological regression ("ER")—to analyze the election data for Farmers Branch in his 2011 report, the parties rely particularly on EI in R, which defendants' expert, Dr. Alford, used in his expert report and Dr. Engstrom relied on in his supplemental expert report. *See Benavidez v. City of Irving*, 638 F.Supp.2d at 723 ("HPA and ER were both approved in *Gingles* and have been utilized by numerous courts in Voting Rights Act cases. Recently, EI has been used to supplement evidence derived from HPA and ER.") (citations omitted). According to Dr. Engstrom, EI in R is the improved version of EI, which he describes as a superior statistical analysis. Dr. Engstrom explains that EI and EI in R are superior because (1) EI incorporates a "method of

- 23 -

estimate, which is "the best estimate produced by the statistical procedure" or "the most likely value," Tr. 2:39, and the confidence interval,[23] which is "the range of estimates within which we can be 95 percent confident, statistically, that the true value of a group's support for a candidate falls," Ps. Ex. 21 at 2, *see also* Tr. 2:49.  The results, using EI in R, are as follows:

| Election | | Percent of Hispanic Voters | Percent of Non-Hispanic Voters |
|---|---|---|---|
| Place 1, 2007: Galvez | Point Estimate | 88.1% | 2.0% |
| | 95% Confidence Interval | 77.2% - 94.6% | 1.1% - 3.2% |
| Place 2, 2008: Rendon | Point Estimate | 67.7% | 30.0% |
| | 95% Confidence Interval | 10.6% - 93.3% | 23.8% - 36.0% |
| Place 2, 2008: Rendon + Villarreal | Point Estimate | 80.0% | 30.5% |
| | 95% Confidence Interval | 27.4% - 97.6% | 26.2% - 36.6% |
| Place 3, 2009: Villafranca | Point Estimate | 54.1% | 28.7% |
| | 95% Confidence Interval | 9.3% - 90.5% | 20.6% - 33.5% |
| Place 2, 2011: Viveros | Point Estimate | 72.0% | 42.1% |
| | 95% Confidence Interval | 13.7% - 98.5% | 37.4 - 48.6% |

---

bounds," which limits the estimates between 0 and 100; (2) EI does not rely on an assumption of linearity but instead uses a maximum likelihood estimation; and (3) EI in R, specifically, provides accurate confidence intervals.  Tr. 2:44-46.

[23]According to Dr. Engstrom, it is standard in the area of political science for confidence intervals to be set at 95%.

Ps. Ex. 21 at 5.  Because there were two Hispanic candidates in the 2008 election—Ruben Rendon ("Rendon") and Claudia Villarreal ("Villarreal")—Dr. Engstrom analyzed Hispanic and non-Hispanic support only for Rendon, the favored Hispanic candidate of the two, and both Rendon and Villarreal.  Additionally, plaintiffs presented several Hispanic witnesses who testified that they voted for the Hispanic candidate in at least some of these elections.

Although defendants' expert, Dr. Alford, conducted a separate analysis using EI in R,[24] defendants acknowledge that "the results of their mathematical analysis [were] not significantly different."  Ds. Prop. Find. Fact ("Ds. FF") No. 87.  Because the disagreement lies instead in the legal significance of the data, the court will rely on Dr. Engstrom's results to determine whether plaintiffs have met the second and third prong of the *Gingles* test.

---

[24]Dr. Alford reported the following point estimates:

| Election | Percent of Hispanic Voters | Percent of Non-Hispanic Voters |
|---|---|---|
| Place 1, 2007: Galvez | 80.1% | 4.2% |
| Place 2, 2008: Rendon | 73.6% | 30.5% |
| Place 3, 2009: Villafranca | 72.7% | 28.8% |
| Place 2, 2011: Viveros | 64.7% | 39.8% |

Ds. Ex. 34 at 6.  Because Dr. Alford's report responds to Dr. Engstrom's original report, which did not report support for Rendon *and* Villarreal in the 2008 election or the confidence intervals for his data, Dr. Alford also omitted this information.

C

Dr. Engstrom testified that the four elections together demonstrate that Hispanics in Farmers Branch are politically cohesive, and that non-Hispanics are also politically cohesive in their veto of the Hispanic preferred candidate.  He emphasized that all of the *point estimates* for Hispanics who voted for Hispanic candidates are above 50% and that all of the *point estimates and the highest point in the confidence intervals* for non-Hispanics who voted for a Hispanic candidate are below 50%.  The parties have stipulated that "[n]o Hispanic has been elected as a member of city council or mayor of the City under the at-large election system."  Pretrial Order ¶ 5.

Regarding the second prong, defendants propose as a finding of fact that "[t]he results [of the returns in municipal elections] suggested only moderate cohesion among Hispanic voters with 65 to 75 percent of Hispanic voters typically voting for the Hispanic candidate."  Ds. FF No. 88.  Although Dr. Alford acknowledged in his trial testimony that the 2007 election was racially polarized and satisfied the second and third prongs, he maintained that the 2007 election should not be given great weight because it is the oldest, and the remaining elections of 2008, 2009, and 2011 suggest a pattern of only moderate cohesion among Hispanic and non-Hispanic voters.  Dr. Alford focused particularly on the 2009 election.  He opined that a split 50-50 vote demonstrated zero political cohesion, and that the closer the number was to 50%, the lower the political cohesion.  Dr. Alford testified that the point estimate for Hispanic support of a Hispanic candidate in the 2009 election was low (54.1%), given that it was "below 60 percent," "below 55 percent," and "dangerously close to 50

percent." Tr. 3:52.

Dr. Engstrom, on the other hand, opined that, although the 2009 election was less politically cohesive than were the other elections, it still demonstrated racially-polarized voting. This is because, unlike the first prong, which has an established bright-line test of 50%+, there is no cutoff for political cohesion. Moreover, Dr. Engstrom testified that it was the pattern, not the behavior in a single election, that determined whether political cohesion was established, and that the 2007, 2008, 2009, and 2011 elections together demonstrated a pattern of political cohesion in both Hispanic and non-Hispanic populations.

Defendants also question the reliability of the point estimates for Hispanic voting patterns. Dr. Alford opined that because the ranges of the confidence intervals were much larger in the 2008, 2009, and 2011 elections, he could not be certain that Hispanic and non-Hispanic voters were politically cohesive. For example, although the point estimates for the 2007 election (88.1%) and 2011 (72.0%) election appeared similar, Dr. Alford concluded that because the 2011 confidence intervals ranged from 13.7% to 98.5%, as compared to the 2007 confidence intervals, which ranged from 77.2% to 94.6%, the 2011 point estimate was not at "the same level of precision" and was less reliable than the 2007 point estimate. *Id.* at 3:25; *see also id.* at 3:45-47. Moreover, Dr. Alford maintained, because the confidence interval for the 2011 election extended below 50% (i.e., the point of zero political cohesion) to 13.7%, he was unable "as a social science matter" to conclude that the 2011 election established that Hispanics were politically cohesive. *Id.* at 3:26-27. In response, Dr. Engstrom explained that the confidence intervals for Hispanic voting patterns were "broader"

than for non-Hispanic voting patterns because, while there were more heavily non-Hispanic precincts, resulting in more efficient estimates, there were no heavily Hispanic precincts. *Id.* at 2:55-56.[25]  He also emphasized that the point estimate was the "best estimate," and so it was important that all of the point estimates for Hispanic voting in favor of Hispanic candidates were greater than 50% in the 2007, 2008, 2009, and 2011 elections.

Regarding the second prong, defendants also contend that "[non-Hispanic] voter cohesion is even less, measuring around 60 to 70 percent," Ds. FF No. 90; "[t]he trend over time in Farmers Branch is away from polarized voting," *id.* at No. 91; "[t]he lack of Hispanic success in elections is a function of low concentrations of Hispanic voters combined with low cohesion among Hispanic voters," *id.* at No. 92; and "[t]he [non-Hispanic] cross-over vote of 30-40 percent is higher than is typically seen in cases in which the evidence supports a finding that the majority group votes as a bloc usually to defeat the minority choice," *id.* at No. 93.[26]  While Dr. Alford recognized in his testimony that none of the point estimates or

---

[25]Similarly, Dr. Alford also questioned whether the data could accurately estimate whether Hispanics are politically cohesive, since there is no evidence regarding voting patterns in heavily Hispanic precincts, only less-concentrated Hispanic precincts. Although this may weaken the statistical analysis, it does not preclude a finding that Hispanics are politically cohesive. *See Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1222 (S.D. Tex. 1997) (while recognizing that the statistical analysis was weakened by "the absence of homogeneous 'extreme' Hispanic voting precincts," holding that "Hispanics have voted cohesively"), *aff'd*, 165 F.3d 368 (5th Cir. 1999).

[26]In their proposed findings of fact and conclusions of law, defendants use the term "Anglo" when the evidence pertains not to Anglos but to non-Hispanics.  The court will replace defendants' references to "Anglo" with "non-Hispanic," which is more accurate in the context presented.

points in the confidence intervals for non-Hispanic voters reached 50% or greater, he opined

that "we clearly have evidence of [a] substantial crossover vote" by non-Hispanic voters for

a Hispanic candidate.  Tr. 3:28.  Dr. Alford particularly highlighted that 42.1% of non-

Hispanic voters voted for a Hispanic candidate in the 2011 election.  Dr. Engstrom testified

that while there was a higher degree of non-Hispanic crossover votes in the 2011 election,

not even the highest point in the *confidence interval* was at majority level.  Moreover, Dr.

Engstrom opined that the 2011 election was a "post-litigation election," which is a special

circumstance under the *Gingles* threshold test.  *Id.* at 2:93.  According to Dr. Engstrom, after

litigation is filed, "there's potentially the opportunity to try to hurt the lawsuit by getting

people to vote differently than they have in the past."  *Id.*[27]

---

[27]Defendants assert that "[t]he lack of Hispanic success in elections is a function of low concentrations of Hispanic voters combined with low cohesion among Hispanic voters." Ds. FF No. 92.  Dr. Alford testified that, because Hispanics constitute a bare majority of CVAP in plaintiffs' illustrative districts, it is unlikely that they will successfully elect their preferred candidates even with 88% political cohesion, such as in the 2007 election, because their votes will still result in less than a majority of total votes.  He posits that the only way a Hispanic-preferred candidate can win is with the assistance of non-Hispanic crossover votes.  In other words, Dr. Alford examines political cohesion under the second prong of *Gingles* in the context of the extent of Hispanic CVAP concentration under the first prong to determine whether Hispanics will be successful.  The first and second prongs of *Gingles*, however, are separate considerations.  Under the second prong, *Gingles* directs the court to examine whether Hispanics are politically cohesive because, "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests."  *Gingles*, 478 U.S. at 51.  Thus the focus is whether Hispanics are politically cohesive in general, in order to determine whether the electoral system impedes their preferences, not whether their political cohesion is sufficiently high that it will guarantee a victory by the Hispanic-preferred candidate in the demonstration district.  *Cf., e.g., League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.") (quoting *Johnson v. De Grandy*, 512

D

The court finds that plaintiffs have proved racial bloc voting through statistical evidence from four elections[28] and testimony by witnesses regarding their voting, thus satisfying the second and third prongs of *Gingles*.[29]  *See Westwego III*, 946 F.2d at 1118 ("Usually, plaintiffs in a vote dilution case will attempt to establish both the second and third

_____

U.S. 997, 1014 n.11 (1994)) (internal quotation marks omitted) .

Dr. Alford also testified that, even if plaintiffs' illustrative districts were in place for the elections of 2008 through 2010 (but not 2007 or 2011), Hispanic voters still would not have been the majority of turned-out voters for the illustrative districts.  Instead, Hispanic voters comprised, at most, 42.5% of turned-out voters.  But "low minority voter turnout does not militate against finding a Section 2 violation." *Benavidez v. City of Irving*, 638 F.Supp.2d at 725; *see also United States v. Blaine Cnty. Mont.*, 363 F.3d 897, 911 (9th Cir. 2004) ("[I]f low voter turnout could defeat a section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on.  Thus, the district court did not err by rejecting low voter turnout as evidence of a lack of political cohesion.").  And Dr. Alford acknowledged that the low Hispanic voter turnout could have resulted from discouragement over prior election losses by their preferred candidate.

[28]It is sufficient under the circumstances for plaintiffs to have provided statistical evidence regarding four elections, given that these four are the most recent involving a Hispanic candidate.  *See Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1245 (5th Cir. 1988) (stating that "'the number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances,'" and holding that "[t]he district court was warranted in its focus on those [five] races that had a minority member as a candidate") (alteration omitted) (quoting *Gingles*, 478 U.S. at 57 n.25); *see also Westwego I*, 872 F.2d at 1208 n.7 ("[T]he evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates.").

[29]*Monroe v. City of Woodville, Miss.*, 897 F.2d 763, 764 (5th Cir. 1990) (per curiam) (stating that "[s]tatistical proof of political cohesion is likely to be the most persuasive form of evidence, although other evidence may also establish this phenomenon," such as "lay testimony from members of the community on political cohesion") (citing *Brewer*, 876 F.2d at 448, 453).

*Gingles* factors with statistical evidence of racial polarization of the electorate.").

Plaintiffs have proved that Hispanic voters "vote along racial lines." *Id.* at 1122. The point estimates, which are undisputedly the "best estimates" in the data, for Hispanic votes in favor of a Hispanic candidate establish a pattern of Hispanic bloc voting: 88.1% in the 2007 election,[30] 67.7% in the 2008 election, 80.0% in the 2008 election,[31] 54.1% in the 2009 election, and 72.0% in the 2011 election. The point estimates for the 2007, 2008, and 2011 elections establish overwhelming support by Hispanics for the Hispanic candidates. *Cf. Gingles*, 478 U.S. at 59 ("[B]lack voters' support for black candidates was overwhelming in almost every election. In all but 5 of 16 primary elections, black support for black candidates ranged between 71% and 92%; and in the general elections, black support for black Democratic candidates ranged between 87% and 96%."); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (holding that "district court's finding that racially polarized voting exists is beyond question" and pointing to evidence that, *inter alia*, "the black candidate received an estimated 71.6% of the black vote but only 7.8% of the white vote"). While the point estimate for the 2009 election (54.1%) is lower than the rest, "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Gingles*, 478 U.S. at 57 ("[I]n a district where elections are shown usually to be polarized,

_____

[30]Although defendants suggest that the court ignore the 2007 election merely because it is older, the court declines, finding that a 2007 election is still probative.

[31]The percentages of 67.7% and 80.0% are derived from the same 2008 election.

the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting."); *see also Teague*, 92 F.3d at 288 ("[T]he results of a couple of elections do not discount the presence of racial bloc voting[;] ... a showing that bloc voting is not absolute does not preclude a finding of racial polarization[;] . . . to be legally significant, racial polarization need only be the 'usual' pattern for a significant proportion of voters.") (alterations omitted) (quoting *Gingles*, 478 U.S. at 57).[32]   Moreover, in arguing that Hispanics are only *moderately* politically cohesive, defendants implicitly recognize that Hispanics are in fact politically cohesive to a certain extent.  *See* Ds. FF No. 88.[33]

Plaintiffs have also established a pattern of non-Hispanic bloc voting.  The point estimates for non-Hispanic votes in favor of Hispanic candidates at the last four elections never exceeded 50%, and in most years did not exceed even 33%: 2.0% in the 2007 election; 30.0% for one Hispanic candidate in the 2008 election, and 30.5% for the other Hispanic

---

[32]Although defendants suggest that the point estimate in the remaining 2009 election (54.1%) demonstrates zero to low political cohesion because it is close to 50%, *Gingles* did not adopt a bright line test for determining when a minority group is politically cohesive, recognizing instead that "the threshold of legal significance will vary from district to district." *Gingles*, 478 U.S. at 55-56.

[33]In making this determination, the court recognizes that the confidence intervals for Hispanic voting patterns are broad. Dr. Engstrom persuasively testified that this was because there were no data on precincts with a high concentration of Hispanic voters. There does not appear to be a solution to this problem, however, and defendants do not offer one. Moreover, it is undisputed that a point estimate is the "best estimate" for the data, and the court will therefore rely on these point estimates.

candidate in the 2008 election;[34] 28.7% in the 2009 election; and 42.1% in the 2011 election.

*Cf. Gingles*, 478 U.S. at 59 (recognizing that district court had found "a substantial majority

of white voters would rarely, if ever, vote for a black candidate" because, *inter alia*, "[i]n the

primary elections, white support for black candidates ranged between 8% and 50%, and in

the general elections it ranged between 28% and 49%"); *Campos v. City of Baytown, Tex.*,

840 F.2d 1240, 1249 (5th Cir. 1988) (holding that "the evidence was sufficient to show that

the whites vote sufficiently as a bloc to overcome the minority votes plus the white

'crossover' vote" and noting three election results that are illustrative: "Mario Delgado

received approximately 83% of the minority votes but only 37% of the Anglo vote and lost

the election . . . . Tony Campos received 63% of the minority vote but only 29% of the white

vote and lost the election . . . . Ruby Hardy received approximately 78% of the minority vote

but only 3% of the white vote and lost the election."). Moreover, none of the points within

the confidence intervals reached majority level—the highest confidence interval is 48.6% for

the 2011 election. Although defendants are correct that there was a substantial non-Hispanic

crossover vote in the 2011 election (42.1%), "*Gingles* does not require total white bloc

voting. Instead, it requires only that 'white majority votes sufficiently as a bloc to enable it

. . . usually to defeat the minority's preferred candidate.'" *Campos*, 840 F.2d at 1249

(alteration in original) (quoting *Gingles*, 478 U.S. at 51). "[I]n general, a white bloc vote that

normally will defeat the combined strength of minority support plus white 'crossover' votes

---

[34]The 30% and 30.5% figures are derived from the same 2008 election in which two
Hispanic candidates ran.

rises to the level of legally significant white bloc voting.'" *Gingles*, 478 U.S. at 56; *see also Rangel v. Morales*, 8 F.3d 242, 245 (5th Cir. 1993) (requiring "evidence of 'a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes'") (quoting *Gingles*, 478 U.S. at 56).  Despite the 72.0% Hispanic vote and the 42.1% non-Hispanic crossover vote in favor of the Hispanic candidate in 2011, the Hispanic candidate still lost the election.  Moreover, as plaintiffs point out, a special circumstance may explain the increased non-Hispanic crossover vote.  In *Gingles* the Court stated that a district court "could properly consider to what extent 'the pendency of this very litigation [might have] worked a one-time advantage for [minority] candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting.'" *Gingles*, 478 U.S. at 76 (alteration in original) (quoting *Gingles v. Edmisten*, 590 F. Supp. 345, 367 n.27 (E.D.N.C. 1984)); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 556-57 (9th Cir. 1998) (per curiam) (holding that it was not necessary for plaintiff to demonstrate *intent* to thwart the vote dilution lawsuit, just that "a district court should cautiously view minority electoral success achieved after a vote dilution lawsuit is filed").

Accordingly, the court finds that plaintiffs have satisfied the second and third prongs of *Gingles.*

V

Because plaintiffs have proved the threshold *Gingles* test factors, the court now turns

to whether, under the totality of the circumstances, they have established that they "do not

possess the same opportunities to participate in the political process and elect representatives

of their choice enjoyed by other voters." *LULAC II*, 999 F.2d at 849.

A

Plaintiffs assert that the following factors identified in *Gingles* establish a voting

rights violation under the totality of the circumstances: (1) City Council elections are racially

polarized; (2) Farmers Branch employs a place system, which can prevent bullet, or single-

shot, voting; (3) Hispanics in Farmers Branch bear the effects of past discrimination due to

hostile immigration ordinances that have hindered their ability to participate effectively in

the political process; (4) overt and subtle racial appeals have been used in the City Council

elections; (5) no Hispanic candidate has ever been elected to the City Council or as mayor

in Farmers Branch; and (6) elected officials of Farmers Branch have not only been

unresponsive to the needs of the Hispanic community, they have been consistently hostile,

as shown by the passage of a resolution establishing English as an official language and the

removal of Spanish literature from the public library and the Spanish channel from the

Farmers Branch recreation center television.

Defendants do not specifically contest the factors on which plaintiffs rely. Instead,

they assert on the following grounds that plaintiffs have not established a voting rights

violation: (1) because plaintiffs drew their illustrative districts to include a substantial

number of non-citizens, the districts have fewer than 60% of the remaining districts' CVAP, resulting in a vote's receiving unequal weight across districts; (2) in 2007, 2008, 2009, and 2011, none of the illustrative districts received a majority of votes by individuals with Spanish surnames; and (3) the trend for Hispanic participation in elections in the illustrative districts is down.

B

"[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). This not such a "very unusual case." Plaintiffs have proved a voting rights violation under the totality of the circumstances.

It is well-established that the existence of racially polarized voting and the extent to which minority group members have been elected to public office are the most important factors to be considered in a totality determination. *See Gingles*, 478 U.S. at 48 n.15. Both of these factors favor plaintiffs. Plaintiffs have proved that the City Council elections in 2007, 2008, 2009, and 2011 were moderately to highly racially polarized, because Hispanic candidates received support from an estimated 54.1% to 88.1% of Hispanic voters compared to only 2.0% to 42.1% of non-Hispanic voters. The parties have stipulated that "[n]o Hispanic has been elected as a member of city council or mayor of the City under the at-large election system." Pretrial Order ¶ 5 (stipulation of fact).

Plaintiffs have also presented the testimony of Dr. Engstrom that Farmers Branch uses a place system instead of a pure at-large system. Under a pure at-large system, all candidates are "elected at-large at the same time," and a voter can cast as many votes as seats. *See United States v. Blaine Cnty. Mont.*, 363 F.3d 897, 913 n.25 (9th Cir. 2004). This presents a minority group with the opportunity to elect its preferred candidate through bullet voting, which "refers to a voting practice in which voters are allowed to cast fewer than all of their votes," *Westwego III*, 946 F.2d at 1113 n.3, thereby permitting a minority group to "concentrate their vote on electing one minority-preferred candidate, while the majority vote will be split among the majority candidates," *see Blaine County*, 363 F.3d at 913 n.25. Under a place system, a candidate must "declare for a particular seat on a governmental body. The candidate then runs only against other candidates who have declared for that position. The voters then have one vote for that seat." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1544 n.1 (5th Cir. 1992) (quoting *Campos*, 840 F.2d at 1242 n.1). A place system "can, under certain circumstances, frustrate bullet voting." *Gingles*, 478 U.S. at 39 n.6; *see also Salas*, 964 F.2d at 1544 n.1 ("[A numbered-post system] prevents the use of bullet, or single shot, voting.") (quoting *Campos*, 840 F.2d at 1242 n.1). This factor weighs in favor of plaintiffs because it can enhance the difficulty faced by Hispanics in seeking access to the political process in Farmers Branch. *See Gingles*, 478 U.S. at 45.

Plaintiffs have established that the Farmers Branch City Council passed Resolution No. 2006-130, which "declar[es] English as the official language of the city of Farmers Branch." Ps. Ex. 20. There is evidence of at least one proposal to eliminate foreign language

materials from the library.  *See* Ps. Ex. 18 (Dep. of Ben Robinson ("Robinson")) at 8 (stating

that he was "not really sure" what became of the proposal to eliminate foreign language

materials from the library).[35]  And plaintiff Alfonso Baladez testified that he did not vote in

the 2011 City Council election because he "gave up,"—"the people that [he] voted for were

never elected.   And there was nobody there representing the community, the Hispanic

community."  Tr. 1:35.  Although this testimony does not fall within one of the totality of the

circumstances factors, it does suggest that the perception that the Farmers Branch at-large

system dilutes the Hispanic vote hinders effective participation in the political process.

Because the *Gingles* factors are "neither comprehensive nor exclusive," and "other factors

may also be relevant and may be considered" *Gingles*, 478 U.S. at 45, the court finds this

---

[35]On June 21, 2012 defendants filed a motion to exclude depositions or deposition excerpts and objections to exhibits, under Fed. R. Civ. P. 32.  Defendants requested the exclusion of five depositions: Ps. Ex. 15-19.  Robinson's deposition excerpts are contained in Ps. Ex. 18.  One ground of defendants' motion was that plaintiffs had violated N.D. Tex. Civ. R. 26.2(c) by designating the complete deposition of each witness, as opposed to the specific portions on which they intended to rely.  Following a discussion of the motion during the pretrial conference, plaintiffs substituted new Ps. Exs. 15 and 17-19, composed of excerpts from the depositions.  At trial, they moved to admit Ps. Exs. 15 and 17-19. Defendants objected based on relevance.  The court overruled the relevance objection, holding that, after considering all of the evidence and the closing arguments, it would give the deposition testimony the weight it deserved.  The court now concludes that Robinson's deposition testimony (Ps. Ex. 18) is relevant within the meaning of Fed. R. Evid. 401 to plaintiffs' voting rights claim because it bears on the totality of the circumstances.

Defendants also requested the opportunity to examine the deposition excerpts to confirm that they were consistent with the versions produced before trial.  The court admitted the depositions "subject to the defendants['] moving to strike an exhibit in whole or in part based on inaccurate designation, provided . . . that [defendants do so] before the plaintiffs rest."  Tr. 1:48.  Defendants did not make such a motion.

also weighs in favor of plaintiffs' § 2 claim.[36]

Both sides proffer other arguments for or against a finding of a voting rights violation under the totality of the circumstances, but the court need not address them in detail.[37] The

---

[36]Although plaintiffs also cite in support the removal of a Spanish language channel from the recreation center television, the testimony of Jose Galvez ("Galvez"), a Hispanic candidate at the 2007 City Council election, is the only probative source of this evidence. The court heard Galvez's testimony subject to defendants' objection. In a bench trial, it is permissible for the court to hear evidence that it later determines is inadmissible or immaterial. *See Harris v. Rivera*, 454 U.S. 339, 346 (1981) (holding that, in a bench trial, the court is presumed capable of hearing otherwise inadmissible evidence and disregarding that evidence when making decisions). The court now excludes the testimony under Fed. R. Civ. P. 26(a)(3)(B) and N.D. Tex. Civ. R. 26.2(b).

Fed. R. Civ. P. 26(a)(3)(A)(i) and (B) require the disclosure of a witness' name, address, and telephone number "at least 30 days before trial." N.D. Tex. Civ. R. 26.2(b) directs that "[a]t least 14 days before the scheduled trial date, the parties must file with the clerk and deliver to opposing parties and the court reporter, separate lists of exhibits and witnesses, except those offered solely for impeachment." Although the trial of this case was set to begin on Monday, June 25, 2012, plaintiffs did not identify Galvez as a trial witness until after the pretrial conference on Friday, June 22, 2012, long after the deadlines imposed by Fed. R. Civ. P. 26(a)(3)(B) and N.D. Tex. Civ. R. 26.2(b). Plaintiffs' justification for their failure to comply with the rules is that they had just recently learned of Galvez as a potential witness. But because he was the only Hispanic candidate for the City Council at the 2007 election, plaintiffs could have learned of his potential role as a witness, and timely designated him, had they exercised due diligence. The court therefore sustains defendants' objections to calling Galvez as a witness at trial, and it declines to consider his testimony in reaching its decision in this case.

[37]Although defendants raise under the totality of the circumstances that plaintiffs' proposed illustrative districts are drawn by packing the districts with non-citizens, the court has already rejected these arguments. *See supra* note 13.

The court also rejects defendants' argument that focuses on evidence that Hispanics, as identified using Spanish surnames, do not comprise the majority of voters in the illustrative districts. *See Benavidez v. City of Irving*, 638 F.Supp.2d at 725 ("[L]ow minority voter turnout does not militate against finding a Section 2 violation."). It is also irrelevant that, according to defendants, the trend in Hispanic participation in elections is down, given that plaintiffs have already established the threshold *Gingles* factors.

- 39 -

two most important—the existence of racially polarized voting and the extent to which minority group members have been elected to public office—support plaintiffs.  And the other evidence the court has considered in § V(B) amply demonstrates that plaintiffs have satisfied their burden of proof.  Plaintiffs have proved, under the totality of the circumstances, that Hispanics in Farmers Branch have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

VI

The court holds that the at-large system of electing members of the Farmers Branch City Council violates § 2 of the Voting Rights Act.  Defendants are therefore ordered to submit, within 60 days of the date of this memorandum opinion and order, a plan to remedy the violation.  *See Westwego III*, 946 F.2d at 1124 ("[I]t is appropriate to give affected political subdivisions at all levels of government the first opportunity to devise remedies for violations of the Voting Rights Act."); *see also E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 703 F. Supp. 28, 29 (E.D. La. 1989) ("Only when the legislative plan is 'uncorrectably invalid' should the court consider a scheme submitted by a private litigant or formulate its own plan."), *aff'd*, 926 F.2d 487 (5th Cir. 1991).  The proposed remedy need not include the creation of one of plaintiffs' proposed illustrative districts.  *See Clark*, 21 F.3d at 95 (citing *Westwego III*, 946 F.2d at 1124).  Plaintiffs may file objections to the

proposal within 30 days of the date it is filed with the clerk of court.[38]

**SO ORDERED**.

August 2, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[38]Of course, once the plan is approved, defendants must also comply with § 5 of the Voting Rights Act.  "Section 5 of the Voting Rights Act requires that any change in a 'standard, practice or procedure with respect to voting' by a 'covered jurisdiction' . . . be submitted to the United States Attorney General for prior approval or 'preclearance.'"  *E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 490 n.1 (5th Cir. 1991) (quoting 42 U.S.C. § 1973c & 28 C.F.R. § 51.1 *et seq.* (1989)).