IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARIA FABELA, et al.,                          §
                                               §
                              Plaintiffs,       §
                                               §   Civil Action No. 3:10-CV-1425-D
VS.                                            §
                                               §
CITY OF FARMERS BRANCH, TEXAS,                 §
et al.,                                        §
                                               §
                              Defendants.       §

MEMORANDUM OPINION
AND ORDER

Following this court's judgment holding that the at-large system of electing members

of the City Council of the City of Farmers Branch, Texas ("Farmers Branch") violates § 2

of the Voting Rights Act of 1965, 42 U.S.C. § 1973, plaintiffs apply for an award of

$325,000 in attorney's fees and $75,000 in costs.  For the reasons that follow, the court

grants the application in part and awards plaintiffs attorney's fees in the sum of $194,125.00

and costs in the sum of $75,000.

I

Plaintiffs, who are Hispanic residents of Farmers Branch,[1] sued Farmers Branch and

members of its City Council, in their official capacities,[2] alleging that the at-large system of

---

[1]Plaintiffs are Maria Fabela, Alfonso Baladez, Amelia Baladez, Maria Baladez, Maria Jacobo, Antonio Reyes, Maria Reyes, Diana Rosas, Leticia Torres, and Jose Villaneda.

[2]Defendants are Farmers Branch, and Tim O'Hare, Harold Froelich, Michelle Holmes, David Koch, Ben Robinson, and Tim Scott, in their official capacities.

electing City Council members violated § 2 of the Voting Rights Act of 1965.  Following a

bench trial, the court held in plaintiffs' favor.  *See Fabela v. City of Farmers Branch, Tex.*,

2012 WL 3135545, at *1, 15 (N.D. Tex. Aug. 2, 2012) (Fitzwater, C.J.), *appeal docketed*,

No. 13-10235 (5th Cir. Mar. 6, 2013).[3]  After defendants submitted a single-member district

plan to which neither plaintiffs nor the Attorney General[4] objected, the court entered

judgment ordering Farmers Branch to utilize the proposed plan.  Defendants have appealed.

Plaintiffs apply under Fed. R. Civ. P. 54(d)(2)(C) and 42 U.S.C. § 1973*l*(e) for an

award of attorney's fees and costs.  They aver that nine professionals from Bickel & Brewer

Storefront, PLLC ("Bickel & Brewer Storefront")[5] performed work on the case, valued at

approximately $450,000, according to the prevailing hourly rates the involved attorneys

charged clients during the relevant time period.  Plaintiffs seek attorney's fees for the work

of four attorneys, totaling 885.5 hours, which is valued at $409,965.00.  Plaintiffs have

voluntarily reduced the amount requested to $325,000.[6]  Under this reduced amount, the

adjusted hourly rates sought are approximately $465.00 for C. Dunham Biles, Esquire

("Biles"); $376.00 for Michael C. Veeser, Esquire ("Veeser"); $376.00 for Greggory A.

---

[3]The court assumes the parties' familiarity with its prior opinion in this case, and thus sets out only the facts necessary to understand this decision.

[4]The Attorney General's decision not to object was necessary under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

[5]Bickel & Brewer Storefront is an affiliate of the law firm Bickel & Brewer, and Bickel & Brewer attorneys participate in Bickel & Brewer Storefront cases.

[6]Plaintiffs do not state that they have reduced their request on the basis of billing judgment.

Teeter, Esquire ("Teeter"); and $258.00 for Nathan D. Pearman, Esquire ("Pearman").

Defendants respond that the hourly rates are unreasonable and should be reduced to between

$300 and $350 per hour for Biles, Teeter, and Veeser, and $200 per hour for Pearman. They

also seek to reduce the number of compensable hours. Defendants contend that 99.5 hours

of Veeser's time should be eliminated because that work was performed before plaintiffs

signed engagement letters with Bickel & Brewer Storefront; that excessive time was spent

drafting the complaint and responding to the motion to dismiss; and that 20 hours should be

deducted for duplicative work that occurred when Teeter took over the case from Veeser.

Defendants do not challenge the amount that plaintiffs seek for costs.[7]

## II

As the prevailing parties in this Voting Rights Act lawsuit, plaintiffs are entitled to

recover attorney's fees. *Leroy v. City of Houston*, 831 F.2d 576, 579 (5th Cir. 1987).[8] The

court follows a two-step process to determine the amount of an attorney's fee award.

---

[7]Plaintiffs apply for an award of costs under 42 U.S.C. § 1973*l*(e), which authorizes the court to award the prevailing party "reasonable expert fees, and other reasonable litigation expenses as part of the costs." Defendants do not contest the reasonableness of $75,000 for costs. The court concludes that the requested sum for costs under § 1973*l*(e) is reasonable.

[8]42 U.S.C. § 1973*l*(e) grants the court discretion, "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment," to award the prevailing party reasonable attorney's fees. Given the strong policy behind awarding fees to prevailing parties, "defendants must make an 'extremely strong showing' of special circumstances to avoid paying attorneys' fees," and the court's discretion to deny fees is "extremely narrow." *Pruett v. Harris Cnty. Bail Bond Bd.*, 499 F.3d 403, 417 (5th Cir. 2007) (citations omitted) (addressing attorney's fees under 42 U.S.C. § 1988). Section 1973*l*(e) is construed consistently with § 1988. *E.g., Leroy*, 831 F.2d at 579 n.4.

> First the court calculates the "lodestar" which is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The court should exclude all time that is excessive, duplicative, or inadequately documented.   Once the lodestar amount is calculated, the court can adjust it based on the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

*Jimenez v. Wood Cnty., Tex.*, 621 F.3d 372, 379-80 (5th Cir. 2010) (some citations omitted).[9]

There is a strong presumption, however, against enhancing the award, because the lodestar method yields a fee that is presumptively sufficient to achieve the objective of "induc[ing] a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A.*, 559 U.S. 542, 130 S.Ct. 1662, 1672-73 (2010).   The fee applicant bears the burden of substantiating both the requested hours and the hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

---

[9]The *Johnson* factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.   The Supreme Court has barred any use of the sixth factor. *Merrick v. Scott*, 2011 WL 1938188, at *1 n.3 (N.D. Tex. May 20, 2011) (Fitzwater, C.J.) (quoting *Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 193 (5th Cir. 1999)).   And the second factor generally cannot be used as a ground for enhancing the award. *Perdue v. Kenny A.*, 559 U.S. 542, 130 S.Ct. 1662, 1673 (2010).

III

As a threshold matter, defendants request that the court abate a decision on attorney's fees pending resolution of their pending appeal.  Defendants note that the court has discretion to abate this decision.  *See* Rule 54 advisory committee's note (1993 Amendments) (noting that courts may defer deciding attorney's fee motion if underlying case is appealed).  And they maintain that abatement is appropriate because the appeal raises uncertainty regarding the amount of fees to award and whether plaintiffs will remain prevailing parties able to recover fees.

The court discerns no significant reason to delay a decision on plaintiffs' application. It is more efficient to resolve the issue now so that any appeal of the attorney's fees decision can proceed in tandem with defendants' appeal on the court's decision on the merits.  *See id.* (highlighting benefits of promptly resolving fee disputes, including ability to make ruling "in time for any appellate review of a dispute over fees to proceed at the same time as review on the merits of the case").  It is also fairer to plaintiffs, as the prevailing parties, because it enables them to recover more promptly their attorney's fees and costs, assuming the appeals on the merits and fees are concluded in their favor.

IV

Turning to the calculation of the lodestar, the court first determines the prevailing hourly rate in the community for similar work.

A

Plaintiffs request attorney's fees totaling $325,000, which equates to approximately

$465.00 per hour for Biles; $376.00 per hour for Teeter; $376.00 per hour for Veeser; and $258.00 per hour for Pearman.  Defendants assert that the proper hourly rate is between $300 and $350 per hour for Biles, Teeter, and Veeser, and $200 per hour for Pearman.  The parties dispute which considerations are material when determining the appropriate hourly rate. Defendants maintain that plaintiffs are basing their requested rates on what their attorneys charge clients for commercial litigation work, rates that defendants maintain are distinct from, and higher than, the prevailing rates in voting rights cases.  Defendants contend that, although plaintiffs are requesting reduced rates, they fail to show that the requested rates are consistent with what is charged in voting rights cases.  Plaintiffs respond that their rates for commercial litigation are within the range charged by lawyers in the community and are therefore reasonable.  They contend that their requested rates should not be reduced for their lack of specialization in voting rights cases because their experience in handling myriad types of complex litigation allows them to successfully prosecute a variety of different claims.

B

"The hourly rates to be used in the lodestar calculation are determined by 'the prevailing market rates in the relevant community.'"  *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2013 WL 598390, at *5 (N.D. Tex. Feb. 15, 2013) (Fitzwater, C.J.) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)), *appeal docketed*, No. 13-10306 (5th Cir. Mar. 20, 2013).  "The prevailing market rate is the rate charged 'for *similar services* by lawyers of reasonably comparable skill, experience, and reputation.'" *Barrow v. Greenville Indep. Sch. Dist.*, 2005 WL 6789456, at *16 (N.D. Tex. Dec. 20, 2005)

(Fitzwater, J.) (quoting *Blum*, 465 U.S. at 895 n.11), *aff'd*, 2007 WL 3085028 (5th Cir. Oct. 23, 2007).  Because the prevailing market rate is that charged for "similar services," the court considers the type of representation and the subject matter of the litigation.  In *Barrow* this court gave less weight to the testimony of attorneys who practiced in complex civil litigation but who did not routinely provide services similar to those at issue—i.e., representing plaintiffs in civil rights and employment discrimination cases.  *See id.*; *see also Buffington v. Balt. Cnty., Md.*, 913 F.2d 113, 130 (4th Cir. 1990) (reversing and remanding attorney's fee award based on hourly rates charged in other civil litigation matters because "[t]hese rates should not have been mechanically accepted in the absence of more specific corroborating evidence of rates charged for *civil rights litigation* in the Baltimore community" (emphasis added)).  Commercial litigation involves a different market for legal representation than does voting rights or civil rights litigation.  *See Pastre v. Weber*, 800 F. Supp. 1120, 1125 (S.D.N.Y. 1991) (noting distinction in fee awards); Alba Conte, 1 Attorney Fee Awards § 4:14 (3d ed. 2013) (observing that "court awards generally reflect higher fees for commercial litigation than for comparable civil rights cases").

    "[T]he relevant market for purposes of determining the prevailing rate to be paid in a fee award is the community in which the district court sits." *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) (citation omitted); *see also McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381-83 (5th Cir. 2011) (stating that, except in certain limited circumstances, district courts must "consider the customary fee for similar work 'in the community,'" not rate charged in out-of-district attorney's home community).  As the fee applicants, plaintiffs bear

the burden of demonstrating "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11. "Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there." *Tollett*, 285 F.3d at 368 (citation omitted). "[T]rial courts are considered experts as to the reasonableness of attorney's fees[.]" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (applying federal law); *Wachovia Bank, Nat'l Ass'n v. Schlegel*, 2010 WL 4275277, at *2 n.4 (N.D. Tex. Oct. 29, 2010) (Fitzwater, C.J.) (same).

## C

As evidence supporting the reasonableness of the requested hourly rates, plaintiffs rely on declarations from Frank Finn, Esquire ("Finn") and Biles. Biles's declaration provides evidence of the prevailing market rate in Dallas for law firms with national litigation practices, but it does not specify rates for civil rights litigation. Finn avers:

> I am aware of the hourly rates of the more successful lawyers in civil rights cases such as this case, and in corporate cases, such as "take-or-pay" cases, white collar crime cases, and corporate white collar cases in the Dallas/Fort Worth area, and the rates of the law firm of Bickel & Brewer Storefront, P.L.L.C. The rates of the lawyers with Bickel & Brewer and Bickel & Brewer Storefront in this matter are consistent with and comparable to the hourly rates being charged by other lawyers in other firms handling similar work. Successful Plaintiffs' lawyers in Dallas County are now regularly charging up to $650 to $750 per hour. As I have reported to this Court before, I am now charging $750 per hour when involved in constitutionally-involved cases of high volatility, renown, and impact upon our community.

- 8 -

Ps. App. 301. Although Finn opines that the requested rates are consistent with and comparable to what plaintiffs' lawyers in the Dallas area are charging for similar work, he does not distinguish rates charged in civil rights cases from the other types of cases he mentions, and this court does distinguish between civil rights cases and complex commercial litigation, as explained above. Finn also fails to offer any supporting examples. He avers that he charges $750 per hour for cases involving constitutional issues, but Finn is a lawyer of considerable reputation and vast experience, who has practiced law since 1956. "Hourly rates are to be computed according to the prevailing market rates in the relevant legal market, not the rates that lions at the bar may command." *Hopwood v. Texas*, 236 F.3d 256, 281 (5th Cir. 2000) (citation and internal quotation marks omitted).

Defendants rely on the declaration of Richard E. Gray, III, Esquire ("Gray"), who provides evidence of hourly rates charged in civil rights cases, but does not specify the prevailing market rate for the Dallas area, "the community in which the district court sits." *Tollett*, 285 F.3d at 368. Gray avers that rates of $400 to $450 per hour are awarded to attorneys with extensive experience in voting rights litigation. The highest award of which he is aware is $450 per hour for Jose Garza, Esquire ("Garza"), an attorney with more than 30 years of experience who focuses almost exclusively on voting rights litigation and is listed as counsel in at least 56 voting rights cases, including two in which he argued before the Supreme Court. Most of Garza's cases were in Texas, although Gray does not specify if any were in the Dallas area. Gray also notes that defendants' attorney, C. Robert Heath, Esquire ("Heath"), charged $350 per hour for this case, which Gray opines is the highest rate

generally available to attorneys like Heath to defend voting rights cases.[10]   Heath is an attorney of considerable experience and reputation who has handled voting rights and redistricting cases for over 30 years.  Gray considers him to be one of the most experienced voting rights litigators in Texas.  Regarding plaintiffs' attorneys, Gray concludes that an appropriate rate for Biles, Teeter, and Veeser is between $300 and $350 per hour, with $350 being "a very generous hourly rate."  Ds. App. 3.  For Pearman, because he was a recently licensed attorney (November 2010), Gray suggests $200 per hour.[11]  Gray bases this opinion, at least in part, on his belief that only Veeser had experience with voting rights cases, and had participated in only two.  Plaintiffs note that Biles also has experience in voting rights matters.  Apart from the instant case, Biles supervised the two voting rights cases on which Veeser worked, and has investigated other potential Voting Rights Act claims against other governmental jurisdictions.

The court is persuaded by defendants' evidence.  Additionally, the court is an expert as to the reasonableness of attorney's fees.  *Primrose Operating Co.*, 382 F.3d at 562.  This court recently awarded attorney's fees in a civil rights case based on hourly rates of $400 and

---

[10]The rate charged by opposing counsel can be relevant, although the Fifth Circuit has held that no such comparison is required.  *See McClain*, 649 F.3d at 384; *id.* at 388 (Dennis, J., concurring) (positing that opposing counsel's rate is relevant and could provide a helpful guide).  *McClain* cautions, however, that "the tasks and roles of counsel on opposite sides of a case vary fundamentally.  If there were logical comparability, this court's decisions would have recognized it in the *Johnson* factors or in past lodestar decisions."  *Id.* at 384.

[11]Biles and Veeser were licensed in 2003, Teeter in 2001, and Pearman in November 2010.

$350.  *See Inclusive Cmtys.*, 2013 WL 598390, at *5-6 (in housing discrimination case, awarding hourly rates of $400 for 35-year lawyer and $350 for 20-year lawyer, who each had practiced civil rights litigation since licensure and had litigated many housing cases).  Before that, it awarded fees based on hourly rates of $350 and $300.  *See Shepherd v. Dall. Cnty., Tex.*, 2009 WL 977295, at *11-12 (N.D. Tex. Jan. 22, 2009) (Stickney, J.), *rec. adopted in relevant part*, 2009 WL 977294, at *3 (N.D. Tex. Apr. 10, 2009) (Fitzwater, C.J.) (in § 1983 action concerning constitutionally inadequate medical care in jail, adopting recommendation that following rates were reasonable: $350 per hour for 15-year lawyer who devoted substantial time during last 10 years to civil rights litigation, and $300 per hour for 17-year lawyer who had expertise in legal research and writing).  Adjusting for the differences between the complexity of those cases and the instant case and between the lawyers in those cases and this one, the court finds that the prevailing market rates for similar services by lawyers of reasonably comparable skill, experience, and reputation in the community in which this court sits are as follows: Biles, $350; Teeter, $300; Veeser, $300; and Pearman, $200 per hour.

V

Having determined the hourly rates for plaintiffs' attorneys, the court considers defendants' objections to the number of hours to be included in the lodestar calculation.

A

At the outset, the court addresses plaintiffs' opposition to reductions in the number of compensable hours affecting the requested award amount of $325,000.  Plaintiffs state that

- 11 -

they voluntarily deducted $84,965.00 from the value of the time expended by Biles, Veeser, Teeter, and Pearman, and they propose that any fee reduction should come first from the voluntary deduction, not from their request for $325,000 in fees.  Plaintiffs' proposal rests on the assumption that the appropriate hourly rates for their attorneys in this case entitle them to an award exceeding $325,000—which would be true only if the prevailing market rate exceeded the adjusted hourly rates that compose the sum of $325,000 that plaintiffs request. But because the reasonable hourly rates determined by the court do not exceed the adjusted rates, *see supra* § IV(C), a fundamental predicate for their argument has fallen away. Morever, plaintiffs' voluntary deduction does not reflect the exercise of billing judgment; they maintain that all hours billed by Biles, Veeser, Teeter, and Pearman were reasonably expended on the litigation.  The court therefore declines to credit the fee reductions from the voluntarily-reduced sum of $84,965.00.

## B

Defendants object to 99.5 hours of Veeser's time on the basis that he performed this work before plaintiffs entered into an attorney-client relationship by signing engagement letters with Bickel & Brewer Storefront on June 10, 2010.  Defendants maintain that work performed before the attorney-client relationship began is not chargeable to the client, and defendants cannot be liable for that work under a fee-shifting statute by reason of the principle that "[h]ours . . . not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to [a fee-shifting statute]."  *Hensley*, 461 U.S. at 434 (citation omitted).  Plaintiffs do not dispute defendants' reasoning, but they reply that they met with

- 12 -

their attorneys to confirm representation on March 11, 2010, and thus at least by that time an attorney-client relationship existed.[12]

Defendants do not cite any authority that specifically holds that services performed before an attorney-client relationship exists are non-compensable under a federal fee-shifting statute. *Hensley* did not purport to address this issue; the Court was addressing billing judgment and holding that the same billing practices that an attorney would employ for a private client, such as reductions for excessive or duplicative time, must be applied in the statutory, fee-shifting context. *See Hensley*, 461 U.S. at 434. Courts have consistently held that fee-shifting statutes allow compensation for services rendered before a representation agreement was executed. *See, e.g., Lewallen v. City of Beaumont*, 2009 WL 2175637, at *4 (E.D. Tex. July 20, 2009) (collecting cases), *aff'd*, 394 Fed. Appx. 38 (5th Cir. 2010). Because there is no *per se* ban against awarding fees for services provided before an attorney-client relationship exists, the relevant question is whether the time was "reasonably expended *on the litigation*." *Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234, 242-43 (1985); *see also Lewallen*, 2009 WL 2175637, at *4 ("The Court agrees that a party may

---

[12]For the work performed before March 11, 2010 plaintiffs state that, to avoid argument, they do not seek to recover such fees, but they propose that the court deduct this sum from their voluntary fee reduction of $84,695.00 and not reduce the overall award amount. Although plaintiffs state that they do not intend to seek fees for work performed before March 11, 2010, the court construes this statement as conditioned on the court's applying any reduction to the sum of $84,695.00 rather than reducing the overall amount of the fee award. Because any elimination of the billed hours would reduce the overall award, *see supra* § V(A), the court will address the merits of defendants' objection and determine whether the services provided before March 11, 2010 are compensable.

- 13 -

be compensated for work performed prior to the execution of a representation agreement, so long as the time spent is reasonable, and the work is reasonably related to the claims Plaintiff pursues in the lawsuit.").   Of course, when evaluating services performed prior to the formation of an attorney-client relationship, a distinction should be drawn between general research on an area of law—which is more properly reflected in the attorney's reasonable hourly rate as a measure of his expertise—and research specific to a case—which is compensable based on the amount of time reasonably expended.  *Cf. Webb*, 471 U.S. at 243 ("Of course, some of the services performed before a lawsuit is formally commenced by the filing of a complaint are performed 'on the litigation.'  Most obvious examples are the drafting of the initial pleadings and the work associated with the development of the theory of the case." (footnote omitted)).

From the court's review of the billing records, all of the entries leading up to plaintiffs' signing the engagement letters show work specific to this case.[13]  Accordingly, the court declines to reduce the award in response to defendants' objection that an attorney-client relationship had not yet been formed.

---

[13]Although there are a few entries regarding Veeser's review of the "Reyes case," Ps. App. 124—presumably the appeal in *Reyes v. City of Farmers Branch, Texas*, 586 F.3d 1019 (5th Cir. 2009), and/or the district court proceedings in that case—*Reyes* also involved a challenge to Farmers Branch's at-large method of electing City Council members.  Because *Reyes* was decided adversely to the plaintiffs who filed that suit, and competent counsel in this case should have been prepared to address the types of deficiencies found in the *Reyes* plaintiffs' presentation, these services were reasonably performed in this case.

C

Defendants next argue that Veeser spent an unreasonable amount of time drafting the complaint. Gray avers that an experienced voting rights attorney would have been able to prepare the complaint in fewer than 10 hours, but that plaintiffs' attorneys' billing records show that between 65 and 75 hours were spent preparing it. Defendants therefore maintain that any time beyond 10 to 15 hours is unreasonable and should be deducted. Plaintiffs respond that the time spent preparing the complaint included more than drafting itself—Veeser was ensuring that he had the necessary data and analysis before filing the complaint. Plaintiffs maintain that their attorneys' thorough preparation increased the efficiency with which they could complete discovery and trial. Defendants respond that the billing entries styled "prepare complaint" are properly understood as time spent drafting the complaint, and not fact gathering, because separate entries specify fact research and conferences with experts.

Plaintiffs' billing records reflect that up to 75.4 hours were spent "prepar[ing] the complaint." The court cannot determine the precise amount of time expended because, in addition to entries totaling 5.5 hours that only state "prepare complaint," all of the other time entries that include "prepare complaint" are block billed.[14] Moreover, plaintiffs do not

_____

[14]Block billing—the practice of grouping several different tasks under one billing entry—is disfavored because it prevents the court from accurately determining the time spent on any particular task, thus impairing the court's evaluation of whether the hours were reasonably expended. *Fralick v. Plumbers & Pipefitters Nat'l Pension Fund*, 2011 WL 487754, at *5 (N.D. Tex. Feb. 11, 2011) (Fitzwater, C.J.). Here, the block-billed entries can be roughly categorized as follows: 10.6 hours for "prepare complaint; pursue strategy," Ps.

- 15 -

explain precisely what "prepare complaint" means, which also impairs the court's ability to determine whether the time spent preparing it was reasonable. This is problematic because, although 75.4 hours spent *drafting* the complaint would be patently unreasonable, if "preparation" also included, for example, factual research and analysis, a greater time expenditure would be reasonable. Such services could have been necessary, for example, to ensure that plaintiffs had grounds even to file this lawsuit. The court acknowledges the beneficial results of thoroughly preparing the complaint—e.g., discovery proceeded quickly and smoothly—and that compensation for time spent beyond the mere *drafting* of a complaint could be entirely reasonable. But the use in this case of the inadequate description "prepare complaint" and the practice of block billing prevent the court from determining how much time was spent drafting the complaint, analyzing facts and law, or performing the other tasks included in the block-billed entries. Based on the billing records and the court's study of the complaint itself, the court finds that 10 hours were reasonably devoted to drafting the complaint. Because the court is disallowing any further time spent "preparing" the complaint and cannot discern from the block-billed entries how much time was spent on any of the other listed tasks, the court disallows the remaining 65.4 hours.

---

App. 125-29; 19.5 hours for "prepare complaint; pursue strategy; prepare filing of materials," *id.*; 13 hours for "prepare complaint; pursue strategy; prepare certificate of interested persons," *id.*; 16.4 hours for "prepare complaint; [various research]," *id.*; 2.9 hours for "prepare complaint" block billed with four other tasks, *id.*; and 7.5 hours for "revise and file complaint; prepare interview materials," *id.*

D

Defendants assert that Veeser spent an unreasonable amount of time responding to their motion to dismiss.  Gray avers that an attorney experienced with the Voting Rights Act would only have expended 80 hours researching and responding to the motion to dismiss, and likely considerably less time.  Defendants contend that the motion to dismiss was limited to whether claim or issue preclusion applied, and that they furthered narrowed the issue through admissions in their brief.  Plaintiffs respond that their attorneys expended an appropriate amount of time to ensure the case would not be dismissed.

From the court's review of the billing records, Veeser expended 185.2 hours researching and responding to the motion to dismiss, approximately 64.2 hours of which were spent researching claim and issue preclusion.  Biles spent 11.6 hours participating in the response.[15]  Having studied plaintiffs' August 31, 2010 response to the motion to dismiss and this court's brief (five-page) November 15, 2010 memorandum opinion and order denying the motion, having considered the issues presented in the motion to dismiss and based on its own expertise concerning attorney's fees, the court finds that no more than 50 hours were reasonably expended by Veeser researching and drafting the response and 11.6 hours were reasonably expended by Biles.  The court therefore disallows 135.2 hours expended by Veeser.

---

[15]Defendants do not challenge the reasonableness of the time Biles spent.

E

Defendants maintain, based on Gray's declaration, that 20 hours should be deducted for duplicative work that occurred when Teeter took over the case from Veeser. Gray does not provide specific information as to which hours should be deducted. He avers that his review of the time records leads him to believe that Teeter spent at least 20 hours, and most likely more, reviewing the work that Veeser had previously done to get up to speed on the case. Plaintiffs respond that Teeter's billing entries for reviewing file materials total only five hours, and that to deduct a portion of these five hours the court must assume that Teeter spent time reviewing materials beyond what Veeser would have done had he continued working on the case.

In calculating the lodestar, the court excludes duplicative time. *See Jimenez*, 621 F.3d at 379-80. Where there is turnover of attorneys working on a case, courts exclude the time expended by the new attorney to become familiar with the case. *See Chaparral Tex., L.P. v. W. Dale Morris, Inc.*, 2009 WL 455282, at *12 (S.D. Tex. Feb. 23, 2009) (excluding 3.5 hours new attorney spent familiarizing himself with case because "'it would be unreasonable to impose on the defendant the cost of plaintiff's counsel's decision to assign a new attorney to the case'" (quoting *Diamond Shamrock Exploration Co. v. Hodel*, 1991 WL 148745, at *1 (E.D. La. July 24, 1991))); *see also Paris v. Dall. Airmotive, Inc.*, 2004 WL 2100227, at *5 (N.D. Tex. Sept. 21, 2004) (Lindsay, J.) (in litigation where plaintiff twice switched law firms, reducing award for time new attorneys spent with plaintiff to learn facts of case and related activity).

From the court's review of the billing records in the three months following Teeter's taking over the case from Veeser, entries totaling 14.9 hours include Teeter's "review" of case materials or law.  Ps. App. 145-46.  All of Teeter's entries that include "review" are block billed.  Any review of time that duplicates Veeser's work should be excluded, but the court cannot determine how much time from each billing entry was spent performing duplicative review.  The court therefore disallows 14.9 hours of Teeter's time to eliminate duplicative work.

F

Accounting for the reductions in the number of compensable hours, the lodestar amounts for each attorney are $11,725.00 for Biles (33.5 hours x $350 per hour); $78,450 for Veeser (261.5 hours x $300 per hour); $85,170 for Teeter (283.9 hours x $300 per hour); and $18,780 for Pearman (93.9 hours x $200 per hour).  The court awards this lodestar amount in the total sum of $194,125.00 because the parties do not argue or offer evidence supporting an adjustment based on the *Johnson* factors, and the court finds no reason to adjust the lodestar based on the *Johnson* factors.

- 19 -

*   *   *

Accordingly, the court grants in part plaintiffs' application for attorney's fees and costs, awarding plaintiffs the sum of $194,125.00 in attorney's fees and $75,000 in costs.

**SO ORDERED**.

June 13, 2013.

SIDNEY A. FITZWATER
CHIEF JUDGE